

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2003 FEB 12 PM 2: 32
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| United States of America<br>ex rel. Cameron R. Gilbert,<br>Bernie A. Hebert, Jr. and Gwendolyn M. McInnis,<br>    Relators | CIVIL ACTION |
| | **03-0437** |
| VERSUS | NO. |
| | SECTION **SECT. T MAG. 5** |
| Donald R. Dizney, David A. Dizney,<br>James E. English, Kevin Barkman<br>Patrick Hammer, Gregg Cunniff,<br>United Medical Corporation, United Medical<br>Corporation of Louisiana,<br>St. Claude Medical Center, LLC<br>(in bankruptcy), United Medical<br>Corporation Of Orlando,<br>Ten Broeck-Dupont Hospital,<br>Ten Broeck-KMI Hospital,<br>Ten Broeck Jacksonville, LLC,<br>Ten Broeck North Carolina, LLC,<br>Ten Broeck Hospitals, Inc.,<br>UMC, Inc. of Kentucky, United<br>Medical Corporation of Tampa,<br>United Medical Corporation of<br>Puerto Rico, Inc., UMC Ten Broeck, Inc.,<br>United Medical Corporation of Kentucky,<br>United Medical Center of New Orleans,<br>Hospital Pavia – Santurce,<br>Hospital Pavia-Hato Rey,<br>San Jorge Children's Hospital,<br>Hospital Gubern, Hospital Perea,<br>Las Marias Reference and O/P Labs.<br>    Defendants | MAGISTRATE<br><br>**FILED *IN CAMERA*<br>UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. §3730(b)(2)**<br><br><br>JURY TRIAL |

1



## COMPLAINT

Relators, **Cameron R. Gilbert, Bernie A. Hebert, Jr. and Gwendolyn M. McInnis**, bring this *qui tam* action for Medicare and Medicaid in the name of the **United States of America**, complaining of defendants, Donald R. Dizney, David A. Dizney, James E. English, Kevin Barkman, Patrick Hammer, Greg Cunniff, United Medical Corporation, United Medical Corporation of Louisiana, United Medical Corporation of Orlando, Ten Broeck Jacksonville, LLC, Ten Broeck Hospitals, Inc., UMC, Inc. of Kentucky, United Medical Corporation of Orlando, United Medical Corporation of Puerto Rico, Inc., UMC Ten Broeck, Inc., United Medical Corporation of Kentucky, United Medical Center of New Orleans, Hospital Pavia – Santurce, Hospital Pavia-Hato Rey, San Jorge Children's Hospital, Hospital Gubern, Hospital Perea, Las Marias Reference and O/P Labs.

## INTRODUCTION

1.      This is an action under the False Claims Act, 31 U.S.C. §§ 3729-3733, against defendants, Donald R. Dizney, David A. Dizney, James E. English, Kevin Barkman, Patrick Hammer, United Medical Corporation, United Medical Corporation of Louisiana, United Medical Corporation of Orlando, Ten Broeck Jacksonville, LLC, Ten Broeck Hospitals, Inc., UMC, Inc. of Kentucky, United Medical Corporation of Orlando, United Medical Corporation of Puerto Rico, Inc., UMC Ten Broeck, Inc., United Medical Corporation of Kentucky, United Medical Center of New Orleans, Hospital Pavia – Santurce, Hospital Pavia-Hato Rey, San Jorge Children's Hospital,

2

Hospital Gubern, Hospital Perea, Las Marias Reference and O/P Labs for monetary damages and civil penalties arising from having knowingly presented false statements and false claims to the United States Department of Health and Human Services ("HHS"), through the Health Care Financing Administration ("HCFA") and agents of the Government, including the States of Louisiana, Florida and Kentucky, through the Louisiana, Florida and Kentucky Departments of Health and Hospitals and the Commonwealth of Puerto Rico, for reimbursement for medical services provided to Medicare and Medicaid participants.

2.      St. Claude Medical Center, LLC is subject to a petition for involuntary bankruptcy pending in the U.S. Bankruptcy Court for the Eastern District of Louisiana, Case No.02-18391. An order lifting the automatic stay has been issued by the U.S. Bankruptcy Court and a copy of the order is attached. It is the operating company for the St. Claude Medical Center in New Orleans, Louisiana. It is wholly owned by United Medical Corporation of Louisiana, which is wholly owned by United Medical Corporation.

## THE PARTIES

**Relators**

3.      Relators, Cameron R. Gilbert, a citizen of the State of Louisiana, with a present residence in the State of Indiana, Bernie A. Hebert, Jr. and Gwendolyn M. McInnis, citizens of, domiciled and residing in the State of Louisiana, and the persons who institute and prosecute this action for

3

violations of 31 U.S.C. §§ 3729-3733 for themselves and for the United States of America pursuant to the provisions of 33 U.S.C. § 3730(b)(1).

4.       Cameron Gilbert is a citizen of the State of Louisiana and resident of the State of Indiana. On May 1, 1999, Mr. Gilbert was hired by United Medical Corporation as a vice president of operations and assigned to work at the Ten Broeck Hospital facility located in Louisville, Kentucky. On or about April 4, 2001, Mr. Gilbert was reassigned to serve as chief executive officer of the St. Claude Medical Center. At all times relevant hereto, Mr. Gilbert was a vice president member of the UMC executive team and reported directly to Patrick Hammer, James English, David Dizney and Donald Dizney.

5.       Relator Cameron Gilbert, as a regional Vice-President of Operations and CEO of St. Claude Medical Center, was responsible for certain areas of operations for a five-hospital healthcare system, including profitability, clinical delivery, growth, physician relations, contracting, regulatory compliance and direct supervision of healthcare executives and managers.

6.       In January of 2001, UMC directed Gilbert to assume the responsibilities as CEO of St. Claude Medical Center in New Orleans and required that plaintiff move his residence to the New Orleans area.

7.       On July 23, 2002, Gilbert was wrongfully terminated from his employment with United Medical Corporation; Ten Broeck Hospital, KMI; Ten Broeck Hospital, Dupont; Ten Broeck Hospital Jacksonville, and St. Claude Medical Center, LLC, in violation of LSA-RS 23:967 because of Gilbert's

disclosure or threats to disclose workplace acts or practices that are in violation of Louisiana law as referenced above, and which will be provided in more detail at the trial of this matter.

8.      At all times relevant hereto, Patricia Grunewald was the chief nurse executive and chief regulatory compliance officer for the defendants' hospitals.

9.      Bernie A. Hebert, Jr. is a resident of the State of Louisiana. For the period October 1996 to August 2001, Mr. Hebert was employed by defendant as the Chief Financial Officer for St. Claude Medical Center. Mr. Hebert presently serves as the Chief Financial Officer for Louisiana University Medical Center (Medical Center of Louisiana, formerly Charity Hospital). Mr. Hebert repeatedly warned defendants, including Greg Cunniff, of the unlawful activity identified herein and argued for reform of these business practices.

10.     Gwendolyn M. McInnis is a resident of the State of Louisiana. She is a registered nurse and holds a master's degree in hospital administration. She was employed by defendants at St. Claude Medical Center beginning in 1997. In January of 1999, she became the director and chief executive officer of St. Claude Medical Center. Her employment was terminated July 17, 2001.

11.     She presently serves as the executive director of the West Jefferson Surgery Center, LLC in Marrero, Louisiana. Ms. McInnis repeatedly warned defendants, including Greg Cunniff, of the unlawful activity identified

herein and encouraged broad reforms to conform operations to federal and state law and regulations, resulting in her termination on the orders of Donald Dizney.

12. **Defendants**

(a) Defendant, Donald R. Dizney, is a resident of the State of Florida and/or Puerto Rico and a stock owner, chairman and other controlling person of the United Medical Corporation and the other hospital companies made defendant or referenced herein.

(b) Defendant, David A. Dizney, is a resident of the State of Florida and/or Puerto Rico and a stockholder and executive officer for United Medical Corporation and the other hospital companies made defendant or referenced herein.

(c) Defendant, James E. English, is a resident of the State of Florida stockholder and executive officer for United Medical Corporation and the other hospital companies made defendant or referenced herein.

(d) Defendant, Kevin Barkman, is a resident of the State of Florida and an executive vice president of United Medical Corporation and directly responsible for the actions of all of the hospital/health-care companies owned and controlled by United Medical Corporation identified herein.

(e) Defendant, Patrick Hammer, a resident of the State of Florida, is an executive vice president of United Medical Corporation and directly

responsible for the actions of all of the hospital/health-care companies owned and controlled by United Medical Corporation identified herein below.

(f)     Defendant, Gregg Cuniff, is a resident of the State of Illinois and at all times relevant hereto was an executive vice president for United Medical Corporation.

(g)     Defendant, United Medical Corporation ("UMC"), is a corporation organized under the laws of the State of Florida and owns and operates the other medical hospital/health-care organizations identified herein.

(h)     Defendant, United Medical Corporation of Louisiana, is a Louisiana corporation wholly owned by United Medical Corporation and is the sole member of St. Claude Medical Center, LLC. It owns all of the assets used at the St. Claude Medical Center in New Orleans.

(i)     Defendant, St. Claude Medical Center, LLC, is a Louisiana limited liability company and operates the St. Claude Medical Center in New Orleans, Louisiana.

(j)     Defendant, United Medical Corporation of Orlando, is a Florida corporation.

(k)     Defendant, Ten Broeck Jacksonville, LLC, is a Florida Limited Liability Company.

(l)     Defendant, Ten Broeck North Carolina, LLC, is a North Carolina Limited Liability Company.

(m)     Defendant, Ten Broeck Hospitals, Inc., is a Florida corporation.

(n)     Defendant, UMC, Inc. of Kentucky, is a Kentucky corporation.

(o)     Defendant, United Medical Corporation of Puerto Rico, Inc.,

(p)     Defendant, UMC Ten Broeck, Inc.,

(q)     Defendant, United Medical Corporation of Kentucky

(r)     Defendant, United Medical Center of New Orleans

(s)     Hospital Pavia – Santurce is a Puerto Rico hospital owned directly or indirectly by UMC.

(t)     Hospital Pavia-Hato Rey is a Puerto Rico hospital owned directly or indirectly by UMC.

(u)     San Jorge Children's Hospital is a Puerto Rico hospital owned directly or indirectly by UMC.

(v)     Hospital Gubern is a Puerto Rico hospital owned directly or indirectly by UMC.

(w)     Hospital Perea is a Puerto Rico hospital owned directly or indirectly by UMC.

(x)     Las Marias Reference and O/P Labs is a Puerto Rico hospital/health-care institution owned directly or indirectly by UMC.

13.     United Medical Corporation of Florida is owned and operated by Donald R. Dizney, David Dizney and James E. English. Donald R. Dizney, David

Dizney and James E. English, either directly or indirectly through UMC, own, control and operate a large number of legal entities, including the defendants, United Medical Corporation, United Medical Corporation of Louisiana, St. Claude Medical Center, LLC (in bankruptcy), United Medical Corporation of Orlando, Ten Broeck Jacksonville, LLC, Ten Broeck Hospitals, Inc., UMC, Inc. of Kentucky, United Medical Corporation of Orlando, United Medical Corporation of Puerto Rico, Inc., Osteopathic Hospitals Of America, Inc., UMC Ten Broeck, Inc., United Medical Corporation of Kentucky and United Medical Center of New Orleans. Defendants Donald Dizney, David Dizney and James English through the defendant companies operate, manage and control the following healthcare institutions (hospitals):

1.) Ten Broeck Dupont Hospital, Louisville, Kentucky.

2.) Ten Broeck KMI Hospital, Louisville, Kentucky.

3.) Ten Broeck Hospital, Jacksonville, Florida.

4.) Ten Broeck Hospital, North Carolina.

5.) St. Claude Medical Center, New Orleans, Louisiana ("St. Claude Medical").

6.) Hospital Pavia-Santurce, Puerto Rico.

7.) Hospital Pavia-Hato-Rey, Puerto Rico.

8.) San Jorge Children's Hospital, Puerto Rico.

9.) Hospital Gubern, Puerto Rico.

10.) Hospital Perea, Puerto Rico.

11.)     Las Marias Reference, Puerto Rico.

12.)     O/P Labs, Puerto Rico.

14.       Donald Dizney, David Dizney and James English are control persons of a unified business system and/or enterprise including United Medical Corporation; United Medical Corporation of Louisiana; St. Claude Medical Center, LLC (in bankruptcy); United Medical Corporation of Orlando; Ten Breock Dupont Hospital, Louisville, Kentucky; Ten Broeck KMI Hospital, Louisville, Kentucky; Ten Broeck Jacksonville, LLC; Ten Broeck Hospitals, Inc.; UMC, Inc. of Kentucky; United Medical Corporation of Puerto Rico, Inc.; UMC Ten Broeck, Inc.; United Medical Corporation of Kentucky; United Medical Center of New Orleans and Double D Race Horse Farms, Ocala, Florida.

15.       The defendant companies are all engaged in related activities providing healthcare services, are unified in their operation, control, commingled funds and personnel, and have a common business purpose.

16.       On information and belief, defendants have each committed multiple predicate acts of mail and wire fraud, by using the U.S. Mails and interstate wire communications in connection with a scheme to defraud the United States Government, employees and vendors to their hospitals, in a continuing pattern of unlawful activity described hereinafter, by transferring funds and information between themselves, by submitting false claims to the Medicare and Medicaid programs, by employing unlawful tax strategies, by intentionally failing to pay vendors and by depriving employees of wages by deducting

substantial funds from each paycheck for the supposed purpose of providing healthcare self-insurance coverage when, in fact, no healthcare fund was provided and payment to healthcare providers and of healthcare claims was intentionally withheld. These acts have been committed by defendants on multiple occasions beginning January 1, 1985 and continuing to the present and on multiple occasions on each day of each and every month and are continuing.

## JURISDICTION AND VENUE

17.     This action arises under 31 U.S.C. §§ 3729-3733, known as the False Claims Act. Jurisdiction over this action is conferred on this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

18.     Personal Jurisdiction is described in paragraphs 3-15, supra.

19.     Venue is proper in the Eastern District of Louisiana under 31U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) as a place where the claims arose and acts complained of occurred and because one or more of the defendants can be found, resides, transacts where the proscribed actions occurred within the Eastern District of Louisiana.

## GENERAL STATEMENTS

### The Medicare Program

20.     The United States, through the Department of Health and Human Services (HHS), administers the Supplementary Medical Insurance Program, Parts A, Hospital Insurance, and B, Medical Insurance, under Title (or

Subchapter) XVIII of the Social Security Act, the Medicare Program. HHS has delegated the administration of the Medicare Program to its component agency, the HCFA (now the Centers for Medicare and Medicaid Services).

21.     Reimbursement for Medicare claims is made by the United States through HHS. HHS, through HCFA, assigns the task of paying Medicare claims from the Medicare Trust Fund to private insurance carriers.

22.     At all times relevant to this Complaint, HHS, through HCFA, administered the Medicare Program in the State of Louisiana through contractual agreements with private insurance carriers ("carriers"), which carriers, as agents of the Government and HHS reviewed and approved claims submitted for Medicare reimbursement by defendants.

23.     The carrier made payments to those claims made by defendants which appeared to be eligible for reimbursement under the Medicare Program.

24.     Health services and medication supplied by providers are reimbursable under the Medicare Program, if the services and medication provided are reasonable and medically necessary.

**The Medicaid Program.**

25.     The Medicaid Program is a jointly funded (up to 75% federally funded) cooperative venture between the Federal and State governments Title (or Subchapter) IXI of the Social Security Act, administered by state governments, in this case, the State of Louisiana and the State of Kentucky.

26.     At all times relevant to this Complaint, the State of Louisiana, through its component department and agency, the Louisiana Department of Health and Hospitals ("LDHH"), acting through its intermediary service contract company reviewed and approved claims submitted for Medicaid reimbursement by the defendants.

27.     On information and belief, the States of Louisiana and Kentucky, through their component departments and agencies, such as the LDHH, made payments, which included federal government funds, on those claims made by defendants which appeared to be eligible for reimbursement under the Medicaid Program.

28.     On information and belief, at all times relevant to this Complaint, the State of Kentucky, through its component department and agency, acting through its intermediary service contract company reviewed and approved claims submitted for Medicaid reimbursement by the defendants.

29.     On information and belief, the State of Kentucky, through its component department and agency, made payments, which included federal government funds, on those claims made by defendants which appeared to be eligible for reimbursement under the Medicaid Program.

30.     Health services and medication supplied by providers are reimbursable under the Medicaid Program, if the services and medication provided are reasonable and medically necessary.

31.     Providers participating in the federal health care programs are required to familiarize themselves with all applicable regulations, procedures and instructions and to certify on each filed cost report that any and all supporting documentation is true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as explicitly noted otherwise.  Federal regulations also require providers to furnish intermediaries all information necessary to assure proper payment under the Medicare program.  Concealment or silence regarding material facts affecting a provider's right to reimbursement claimed is therefore not permissible.

32.     Providers who discover material errors or omissions in claims submitted for reimbursement to Medicare are required to disclose those matters to the Government or its Financial Intermediaries.  Providers are not free silently to accept windfalls from such errors, much less to take steps to conceal them. 42 U.S.C. 1320a-7b(a)(3) creates a duty to disclose known errors in claims by making a failure to disclose a felony.  That statute provides:

> Whoever … having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment … conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized … shall in the case of such … concealment or failure … be guilty of a felony.

33.     Accordingly, providers have an affirmative duty to disclose material information which indicates their reimbursement claims are inaccurate.

34.     Under the applicable sections of United States Code and Code of Federal Regulations, a provider seeking reimbursement under the Medicare and Medicaid Programs must meet certain obligations.  The obligations include the duties to:

a.     bill for only reasonable and necessary medical services;

b.     not make false statements or misrepresentations of material facts concerning requests for payment;

c.     provide evidence that the service given is medically necessary; and

d.     certify when presenting a claim that the service provided is a medical necessity.

35.     Congress has recognized that payment under the Prospective Payment System (PPS) in Medicare may not account for the added cost incurred by hospitals that treat a disproportionate number of low-income patients. Therefore, Congress authorized the Disproportionate Share Hospital Adjustment ("DSH Adjustment") 42 U.S.C. § 1395ww(d)(5)(F), which provides additional payment to qualifying hospitals.  To be eligible for this additional payment, a hospital must meet certain criteria concerning its location and bed size -- for hospitals in urban areas with 100 or more beds.

36.     Under 42 C.F.R. § 412.106(A)(1)(I), the number of beds for purposes of the DSH Adjustment is to be calculated in accordance with § 412.105(b), which also governs additional payments to hospitals for indirect costs and medical education programs ("IME") § 412.105(b) which states:

"Determination for number of beds. For purposes of this section, the number of beds in a hospital is determined by counting the number of **available bed** days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.[1]

37.     Under these regulations, to be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital puts the beds into use when they were needed. The term "available bed" as used for the purposes of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of the facility as beds are added to or taken out of service. The hospital bears the burden of proof to exclude the beds from count. Beds under these regulations are not those in intensive care areas, custodial beds, or beds in excluded units maintained for lodging patients, including beds in intensive care units, coronary care units, neonatal intensive care units and other special care inpatient hospital units. In addition, beds in the following locations are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient areas of the facility not certified as an acute care hospital, labor rooms, PPS extended units such as psychiatric or rehabilitation, outpatient rooms, emergency rooms, ancillary

---

[1] 42 C.F.R. § 412.105(b) (1995

departments, nurses and other staff residences and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging.[2]

## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)

38.     The relevant time period, as used in this Complaint, is the period January 1, 1995 to date, but on information and belief began in 1982.

## Count I

## False Medicare Claims Based on Over-reporting Of Available Beds

39.     The Medicare Program offers hospital providers an amount of annual revenue **(Disproportionate Share)** based upon the number of licensed available beds which a hospital reports.

40.     Healthcare providers, including defendants, make a series of factual representations to Medicaid and Medicare in order to obtain payment of claims. Payments of individual claims and annual disproportionate payments are based upon the representation from the hospital of the number of available licensed beds and the integrity/make-up of the individual program or service that submits the bill. Defendants made knowingly false representations indicating the number of available licensed beds and the integrity/make-up of an out-patient program to receive Medicare and/or Medicaid reimbursement. These false

---

[2] P.R.M. § 2405.3(G)

claims regarding the number of available beds were made at least once each year (1995-2001) in connection with the annual licensing application for each hospital and/or health-care institution, including St. Claude Medical Center, and falsely represented that SCMC had at least 100 available beds, when in fact it had fewer than 50.

41.     The false statements regarding available beds resulted in significant loss to the government through both the payment of monies not due and the time value or interest of the paid monies.

42.     On information and belief, defendants knowingly made false reports in connection with a claim for payment presented or caused to be presented to the US Government by false or fraudulent claims for Medicare. This resulted in government payments to defendants of **$15,000,000** based upon the false statements regarding available beds during the relevant time period and before.

43.     More particularly, during the relevant time period, defendants routinely submitted bills -- on a daily basis -- to Medicare for reimbursement and payment, including but not limited to annual disproportionate payments. These payments were made upon false claims that St. Claude Medical Center had no less than 100 (one hundred) available licensed beds.

44.     Defendants, including James English, David Dizney and Donald Dizney, Greg Cunniff and their attorney, James Cobb, were advised that the hospital was not operating with the required number of available beds but UMC's

executives refused to increase the number of available beds and refused to change the reporting and/or licensing applications to state the correct number of available beds.

45.     A payment is made via the Medicare Cost Report for "Disproportionate Share Adjustment" on Worksheet "E" Part "A" line 4.04. To qualify for this payment, one of the requirements is that the hospital must have 100 available Acute Care beds. Distinct part unites such as St. Claude's SNF and Psych. Units do not qualify as available beds. For most of the time period from 1996 through 2002, there were no nursing call system, no bedding, no furniture, no supplies, no beds and no nursing staff to make the beds on the second and third floor "available." Because there was no nursing call system on part of the second floor and all of the third floor, which is a requirement for licensing, the "licensed" beds for those years should not have been reported at the 136-bed levels and should not have been reported for licensing. Many of the beds on the second and third floors did not have nursing call systems for most of 1996 through 2002, were under construction or completely closed or were in use as part of the Psych Unit.

46.     The following is a bed count by floors at St. Claude Medical:

St. Claude Medical Center
Bed Count by floors
FY 1996

| Floor | Beds | Not Useable | |
|---|---|---|---|
| **2nd Floor** | | | |
| ICU-A | 8 | 1 | Break room |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| | | | |
| **3rd Floor** | | | |
| 301 | 4 | 4 | no call system |
| 302-311 | 20 | 20 | no call system |
| 312 | 4 | 4 | no call system |
| 314 | 1 | 1 | no call system |
| 315 | 1 | 1 | no call system |
| 316 | 4 | 4 | no call system |
| 317-326 | 20 | 20 | no call system |
| 327 | 4 | 4 | no call system |
| 328 | 1 | 1 | no call system |
| 330 | 1 | 1 | no call system |
| | | | |
| **4th Floor** | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 8 | rooms 402 - 405  SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 8 | rooms 423 - 426  SNF |
| 427 | 4 | 4 | SNF Activity room |
| 428 | 1 | 1 | SNF Offices |
| 430 | 1 | 1 | SNF Offices |
| | | | |
| Totals | 136 | 98 | |

47.

St. Claude Medical Center
Bed Count by floors
FY 1997

| Floor | Beds | Not Useable | |
|-------|------|------|------|
| **2nd Floor** | | | |
| ICU-A | 8 | 1 | Break room |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| | | | |
| **3rd Floor** | | | |
| 301 | 4 | 4 | no call system |
| 302-311 | 20 | 20 | no call system |
| 312 | 4 | 4 | no call system |
| 314 | 1 | 1 | no call system |
| 315 | 1 | 1 | no call system |
| 316 | 4 | 4 | no call system |
| 317-326 | 20 | 20 | no call system |
| 327 | 4 | 4 | no call system |
| 328 | 1 | 1 | no call system |
| 330 | 1 | 1 | no call system |
| | | | |
| **4th Floor** | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 8 | rooms 402 - 405  SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 8 | rooms 423 - 426  SNF |
| 427 | 4 | 4 | SNF Activity room |
| 428 | 1 | 1 | SNF Offices |
| 430 | 1 | 1 | SNF Offices |
| | | | |
| **Totals** | 136 | 98 | |

St. Claude Medical Center
Bed Count by floors
FY 1998

## Update for Ferncrest opened Nov. 1998 - April 1999
( 20 beds moved from 3rd floor to Ferncrest)

| Floor | Beds | Not Useable | |
|---|---|---|---|
| **2nd Floor** | | | |
| ICU-A | 8 | 1 | Break room |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| | | | |
| **3rd Floor** | | | |
| 301 | 4 | 4 | no call system |
| 302-311 | 20 | 20 | no call system |
| 312 | 4 | 4 | no call system |
| 314 | 1 | 1 | no call system |
| 315 | 1 | 1 | no call system |
| 316 | 4 | 4 | no call system |
| 317-326 | 20 | 20 | no call system |
| 327 | 4 | 4 | no call system |
| 328 | 1 | 1 | no call system |
| 330 | 1 | 1 | no call system |
| | | | |
| **4th Floor** | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 8 | rooms 402 - 405  SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 8 | rooms 423 - 426  SNF |
| 427 | 4 | 4 | SNF Activity room |
| 428 | 1 | 1 | SNF Offices |
| 430 | 1 | 1 | SNF Offices |
| | | | |
| **Totals** | 136 | 98 | |

22

St. Claude Medical Center
Bed Count by floors
FY 1999
Through 9-99

## Update for Ferncrest opened Nov. 1998 - April 1999
### ( 20 beds moved from 3rd floor to Ferncrest)

| Floor | Beds | Not Useable | |
|---|---|---|---|
| 2nd Floor | | | |
| ICU-A | 8 | 1 | Break room |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| | | | |
| 3rd Floor | | | |
| 301 | 4 | 4 | no call system |
| 302-311 | 20 | 18 | no call system, except for |
| | | | 306 & 307 VIP rooms |
| 312 | 4 | 4 | no call system |
| 314 | 1 | 1 | no call system |
| 315 | 1 | 1 | no call system |
| 316 | 4 | 4 | no call system |
| 317-326 | 20 | 20 | no call system |
| 327 | 4 | 4 | no call system |
| 328 | 1 | 1 | no call system |
| 330 | 1 | 1 | no call system |
| | | | |
| 4th Floor | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 8 | rooms 402 - 405  SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 8 | rooms 423 - 426  SNF |
| 427 | 4 | 4 | SNF Activity room |
| 428 | 1 | 1 | SNF Offices |
| 430 | 1 | 1 | SNF Offices |
| | | | |
| Totals | 136 | 96 | |

St. Claude Medical Center
Bed Count by floors
FY 1999
From 9-99 to 12-99

Psych unit opened Oct. 21, 1999, but not as exempt unit.

| Floor | Beds | Not Useable | |
|---|---|---|---|
| **2nd Floor** | | | |
| ICU-A | 8 | 1 | Break room |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| | | | |
| **3rd Floor** | | | |
| 301 | 4 | 4 | Psych activity room |
| 302-311 | 20 | 20 | rooms 302 - 305  Psych; 306 - 311 no call system & under construction |
| 312 | 4 | 4 | no call system, under construction |
| 313 | 1 | 1 | no call system, under construction |
| 315 | 1 | 1 | Psych suclusion room |
| 316 | 4 | 4 | no call system, under construction |
| 317-326 | 20 | 20 | rooms 323 - 326  Psych; 317 - 322 no call system & under construction |
| 327 | 4 | 4 | Psych activity room |
| 328 | 1 | 1 | Psych nurses station |
| 330 | 1 | 1 | Psych suclusion room |
| | | | |
| **4th Floor** | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 8 | rooms 402 - 405  SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 8 | rooms 423 - 426  SNF |
| 427 | 4 | 4 | SNF Activity room |
| 428 | 1 | 1 | SNF Offices |
| 430 | 1 | 1 | SNF Offices |
| | | | |
| Totals | 136 | 96 | |

St. Claude Medical Center
Bed Count by floors
FY 2000
Through Aug. 2000

|  | Floor | Beds | Not Useable | |
|---|---|---|---|---|
| 2nd Floor | | | | |
| ICU-A | | 8 | 1 | Break room |
| ICU-B | | 1 | | |
| 265 | | 2 | 2 | no call system |
| 267 | | 4 | 4 | no call system |
| 269 | | 1 | 1 | no call system |
| 3rd Floor | | | | |
| 301 | | 4 | 4 | Psych activity room |
| 302-311 | | 20 | 20 | rooms 302 - 305  Psych; 306 - 311 no call system & under construction |
| 312 | | 4 | 4 | no call system, under construction |
| 313 | | 1 | 1 | no call system, under construction |
| 315 | | 1 | 1 | Psych suclusion room |
| 316 | | 4 | 4 | no call system, under construction |
| 317-326 | | 20 | 20 | rooms 323 - 326  Psych; 317 - 322 no call system & under construction |
| 327 | | 4 | 4 | Psych activity room |
| 328 | | 1 | 1 | Psych nurses station |
| 330 | | 1 | 1 | Psych suclusion room |
| 4th Floor | | | | |
| 401 | | 4 | 4 | SNF Activity room |
| 402-411 | | 20 | 4 | rooms 404 - 405  SNF |
| 412 | | 4 | | |
| 414 | | 1 | | |
| 415 | | 1 | | |
| 416 | | 4 | 4 | no call system |
| 417-426 | | 20 | | |
| 427 | | 4 | | |
| 428 | | 1 | | |
| 430 | | 1 | | |
| Totals | | 136 | 80 | |

25

St. Claude Medical Center
Bed Count by floors
FY 2000
Aug. 2000 - Dec. 2000

| Floor | Beds | Not Useable | |
|---|---|---|---|
| **2nd Floor** | | | |
| ICU-A | 8 | | |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| **3rd Floor** | | | |
| 301 | 4 | 4 | Psych activity room |
| 302-311 | 20 | 8 | rooms 302 - 305 Psych; |
| | | | 306 - 311 converted for Dr. Cropper |
| 312 | 4 | | converted for Dr. Cropper |
| 313 | 1 | | converted for Dr. Cropper |
| 315 | 1 | 1 | Psych suclusion room |
| 316 | 4 | 4 | Psych activity room |
| 317-326 | 20 | 20 | rooms 321 - 326  Psych; |
| | | | 317 - 320 no call system "medical psych" |
| 327 | 4 | 4 | Psych activity room |
| 328 | 1 | 1 | Psych nurses station |
| 330 | 1 | 1 | Psych suclusion room |
| **4th Floor** | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 4 | rooms 404 - 405  SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 2 | room 426 used for whirlpool |
| 427 | 4 | 4 | PT room |
| 428 | 1 | | |
| 430 | 1 | | |
| **Totals** | **136** | **68** | |

St. Claude Medical Center
Bed Count by floors
FY 2001

| Floor | Beds | Not Useable | |
|---|---|---|---|
| **2nd Floor** | | | |
| ICU-A | 8 | | |
| ICU-B | 1 | | |
| 265 | 2 | 2 | no call system |
| 267 | 4 | 4 | no call system |
| 269 | 1 | 1 | no call system |
| **3rd Floor** | | | |
| 301 | 4 | 4 | Psych activity room |
| 302-311 | 20 | 8 | rooms 302 - 305  Psych; |
| | | | 308 - 311 converted for Dr. Cropper |
| 312 | 4 | | converted for Dr. Cropper |
| 313 | 1 | | converted for Dr. Cropper |
| 315 | 1 | 1 | Psych suclusion room |
| 316 | 4 | 4 | converted for Dr. Cropper, but no call system |
| 317-326 | 20 | 20 | rooms 321 - 326 Psych; 317 - 320 |
| | | | covered for Dr. Cropper, but no call system |
| 327 | 4 | 4 | Psych activity room |
| 328 | 1 | 1 | Psych nurses station |
| 330 | 1 | 1 | Psych suclusion room |
| **4th Floor** | | | |
| 401 | 4 | | |
| 402-411 | 20 | | |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | | |
| 417-426 | 20 | 2 | room 426 used for whirlpool |
| 427 | 4 | 4 | PT room |
| 428 | 1 | | |
| 430 | 1 | | |
| **Totals** | **136** | **56** | |

St. Claude Medical Center
Bed Count by floors
FY 2002

| Floor | Beds | Not Useable | |
|---|---|---|---|
| **2nd Floor** | | | |
| ICU-A | 8 | | |
| ICU-B | 1 | | |
| 285 | 2 | 2 | no call system |
| 287 | 4 | 4 | no call system |
| 289 | 1 | 1 | no call system |
| | | | |
| **3rd Floor** | | | |
| 301 | 4 | 4 | Psych activity room |
| 302-311 | 20 | 8 | rooms 302 - 305 Psych; |
| | | | 308 - 311 converted for Dr. Cropper |
| 312 | 4 | | converted for Dr. Cropper |
| 313 | 1 | | converted for Dr. Cropper |
| 315 | 1 | 1 | Psych suclusion room |
| 316 | 4 | 4 | converted for Dr. Cropper, but no call system |
| 317-326 | 20 | 20 | rooms 321 - 326 Psych; 317 - 320 |
| | | | coverted for Dr. Cropper, but no call system |
| 327 | 4 | 4 | Psych activity room |
| 328 | 1 | 1 | Psych nurses station |
| 330 | 1 | 1 | Psych suclusion room |
| | | | |
| **4th Floor** | | | |
| 401 | 4 | 4 | SNF Activity room |
| 402-411 | 20 | 4 | rooms 404 - 405 SNF |
| 412 | 4 | | |
| 414 | 1 | | |
| 415 | 1 | | |
| 416 | 4 | 4 | no call system |
| 417-426 | 20 | 2 | room 426 used for whirlpool |
| 427 | 4 | 4 | PT room |
| 428 | 1 | | |
| 430 | 1 | | |
| | | | |
| **Totals** | **136** | **68** | |

## Count II

## False Medicaid Payments Based On
## Count of Beds/*Per diem* Payment

48.     The State of Louisiana under its Medicaid program offers hospital providers a per diem payment based upon specific criteria regarding the number of available licensed beds – criteria not met at St. Claude Medical.  St. Claude Medical Center did not have 50 acute care available beds during the relevant time period, but falsely reported 100 such beds.

49.     As a result of the actions of the defendants, defendants knowingly made false reports in connection with a claim for payment presented or caused to be presented to the State of Louisiana by false or fraudulent claims for Medicaid per diem overpayments of $200/day per Medicaid patient for the time period January 1, 1996 to present.

50.     The false statements regarding available beds resulted in false claims being submitted to the Medicaid program for payment on a daily basis during the relevant time period and total **$8,760,000**.

## Count III

## False Medicare Claims Based Upon PHP
## (Outpatient Program) Cost-Based Reimbursement

51.     The U.S., through the Medicare Program, offered a Psychiatric Partial Hospitalization Program which 100% federally subsidized out-patient program. The program was intended to provide a benefit to patients who are

capable of benefiting and who need a short-term intervention that will either help detour an inpatient admission or to help a patient leave an inpatient hospital as soon as medically possible. The program offers very specific criteria for eligibility.

52.     Healthcare providers, including defendants, make a series of factual representations to Medicare in order to obtain payment of claims. Payments of individual claims are based upon the integrity/make-up of the individual program or service that submits the bill. Defendants made knowingly false representations indicating the number of available licensed beds and the integrity/make-up of an out-patient program to receive Medicare and/or Medicaid reimbursement.

53.     The Psychiatric Partial Hospital Program ("PHP") did not meet Medicare regulations for reimbursement because:

1.     Physician component not available;

2.     Patients could not benefit from any program;

3.     Length of stay of most patients exceeded by 40-plus weeks the maximum time period;

4.     The medical director did not perform required duties or obligations.

54.     Medicare payments were based upon and/or for qualified costs incurred by the provider. Defendants assigned inappropriate and non-qualified costs that were submitted to Medicare, such as allocation of UMC executive

salaries, executive travel and entertainment, payment to medical director and allocation of inpatient costs to the outpatient program.

55.    As a result of the actions of the defendants, defendants knowingly made false reports in connection with a claim for payment presented or caused to be presented to the US Government by false or fraudulent claims for Medicare cost-based reimbursement of approximately **$3,000,000** in inappropriate payments to the hospitals Psychiatric Partial Hospital Program ("PHP") during the relevant time period and before. A review of Dr. Carmen Palazzo's admission records will identify the specific false claims.

56.    The false statements regarding available beds and the illegitimacy of the Psychiatric Partial Program resulted in significant loss to the government through both the payment of monies not due and the time value or interest of the paid monies.

57.    In addition, during the relevant time period, the out-patient Partial Hospitalization Program for Psychiatric patients at St. Claude Medical was not a legitimate program that met Medicare criteria (i.e., patients were able to benefit, short-term intervention, doctor presence, therapies were provided, etc). Additionally, the majority, if not all, of the referrals into the program came from one doctor who was paid substantial amounts of money each year by defendants. In May 2000, defendants provided a free trip to the Kentucky Derby for said doctor and her spouse as additional compensation to deliver Medicare and Medicaid patients to St. Claude Medical.

58.     The false statements regarding the Psychiatric Partial Program at St. Claude Medical resulted in false claims being submitted to the Medicare program for payment on a daily basis during the relevant time period.

59.     During the relevant time period, defendants, through their agents and employees in New Orleans, Louisiana, routinely and on a daily basis caused claims to be submitted to the Medicare program for reimbursement at inappropriately high amounts for psychiatric services that did not meet Medicare criteria.   Additionally, inducements were made to the referring doctor for administrative services not performed.  Had claims been submitted for the actual available beds, defendants would have received a significantly lower level of reimbursement.  And had the claims been submitted for the services actually provided by the Psychiatric Partial Hospitalization Program, defendants would have received a significantly reduced reimbursement.

60.     The above false claims were knowingly made by the defendants and still continue to be made with respect to the available beds.

61.     On information and belief, the PHP program at St. Claude Medical managed by Dr. Carmen Palazzo submitted approximately **$3,000,000** in false claims during the period July 1, 1999 to September 1, 2001.  The program did not qualify and all Medicare payments constitute false claims damages.

62.     During the relevant time period, defendants submitted false Medicare claims from their St. Claude Medical hospital in New Orleans, Louisiana.  Inappropriate or nonexistent costs were placed into the Psychiatric

Partial Hospitalization Program which resulted in over-payment by Medicare. These costs included inpatient employees, medical directorship, regional allocations and corporate charges. If accurate costs were submitted, defendants would have received no reimbursement. On information and belief, this action takes place at all hospitals in the US and Puerto Rico which the defendants own.

63.      This action was inappropriate and in violation of Medicare regulations.

64.      Attached hereto as Exhibit 1 is the January 25, 2000 St. Claude Partial Hospital Program Audit Report prepared by M.S. Slutsky & Associates. This report documents numerous irregularities and wrongful actions in connection with the program.

65.      This action resulted in false claims being submitted under the Medicare program.

66.      This action resulted in loss to the Government through both the payment of monies not due and the time interest of the paid monies.

## Count IV

## False Medicare and Medicaid Claims Based Upon Inpatient Psychiatric Care Program

67.      The State of Louisiana offers hospital providers a per diem payment for each qualified Medicaid patient based on the number of licensed available beds which a hospital reports, and meets medical necessity.

68.     During the relevant time period, defendants submitted claims to Medicare and Medicaid for Psychiatric Inpatient Hospital admissions ("IPCP") at St. Claude Medical Center through their compensated medical director for patients who did not meet inpatient criteria and were detained against their will without clinical reason.

69.     This resulted in false claims and civil rights violations.

70.     The false statements regarding available beds and the illegitimacy of the IPCP resulted in significant loss to the government through both the payment of monies not due and the time value or interest of the paid monies.

71.     As a result of the actions of the defendants, defendants knowingly made false reports in connection with a claim for payment presented or caused to be presented to the US Government by false or fraudulent claims for Medicare payments of approximately **$1,000,000** in inappropriate payments to St. Claude Medical Center for its IPCP.

## Count V

## False Medicare and Medicaid Claims Based on
## Inducement/Safe Harbor Violations

72.     During the relevant time period, defendants, through their agents and employees in New Orleans, Louisiana, made inducements to the referring doctor, Dr. Carmen Palazzo, for administrative services not performed.

73. Medicare, Medicaid and the department of Healthcare Financing Administration prohibit health-care providers from providing any financial inducement for patients to enter a hospital for treatment.

74. During the relevant time period, defendants paid prohibited stipends to doctors who referred large numbers of patients in comparison to the rest of the medical staff in New Orleans, Louisiana and in Jacksonville, Florida. Executive Officers were ordered by the defendants to threaten doctors with the removal of compensation (ranging from $50,000 to $900,000 per year per referring doctor) if they did not increase their admissions or reduce care for poor patients. Additionally, CEOs were ordered to threaten Emergency Department doctors with the removal of financial compensation if they did not eliminate non-paying patients from the hospital in New Orleans, Louisiana regardless of the patient's medical condition.

75. During the relevant time period, defendants submitted claims to Medicare and Medicaid for Psychiatric Inpatient Admissions in New Orleans through their compensated medical director for patients who did not meet inpatient criteria and were detained against their will without clinical reason.

76. The majority, if not all, of the referrals into the IPCP came from Dr. Palazzo, who was paid substantial amounts of money each year by defendants. The hospital owners provided a free trip to the Kentucky Derby for Dr. Palazzo and her spouse as additional compensation to deliver Medicare and Medicaid patients to St. Claude Medical.

77.     Defendants are liable for statutory penalties for these violations of law.

## Count VI

### False Medicare and Medicaid Claims Based on Inappropriate Expenses Such as Travel, Entertainment and Alcohol -- Cost Reports

78.     During the relevant time period, defendants submitted false Medicare claims from their St. Claude Medical hospital in New Orleans, Louisiana. Inappropriate or nonexistent costs were placed into the Psychiatric Partial Hospitalization Program which resulted in over-payment by Medicare. These costs included inpatient employees, medical directorship, regional allocations and corporate charges. If accurate costs were submitted, defendants would have received lower or no reimbursement. On information and belief, this action takes place at all hospitals in the US and Puerto Rico which the defendants own.

79.     During the relevant time period, defendants submitted cost reports under Medicare and Medicaid that were inaccurate and overstated for the New Orleans, Louisiana, Jacksonville, Florida and Louisville, Kentucky hospitals. On information and belief, this wrongful scheme also takes place at their Puerto Rico owned hospitals as well. Costs of private jets, first-class plane tickets, coach plane tickets, rental cars, taxi transportation's, food, alcohol and allocated executive salaries were submitted for reimbursement to Medicare through the

cost report that were not related to hospital, healthcare or appropriate business activities. Defendants submitted items for reimbursement that were related to excessive alcohol consumption, gentleman's clubs, gambling and/or private non business party activities.

80.     This activity resulted in false claims being submitted under the Medicare program.

81.     The exact amount of cost report false claims can only be determined by a full audit of defendants' books and records. On information and belief, the amount of cost report false claims exceeds **$1,000,000.**

## Count VII

## False Medicare Claims Based on Failure to Collect
## Co-Insurance Payments or Overcharging

82.     The Medicare Program is a 100% federally subsidized health insurance system. The benefits covered by the Medicare Program include medical and other health services. An enrolled individual who obtains a covered medical service can either pay for the medical service himself, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the provider rendering the service who collects as an assignee of the beneficiary.

83.     Medicare requires that a Medicare patient pay the Medicare deductible each year to Medicare paying for any item of service. Medicare also requires Medicare patients to pay for any item or schedule after the deductible is

met know as the co-payment portion. The co-payment is generally 20 percent of the fee schedule for each item or service.

84.     During the relevant time period, defendants through their agents and employees in Louisville, Kentucky, Jacksonville, Florida, and New Orleans, Louisiana, and upon information and belief, the institutions in Puerto Rico, routinely failed to collect from Medicare patients co-insurance payments as required under Medicare programs. Additionally, Medicaid was routinely billed for the portion not paid by other payers without effort to collect from the patient in each of the states listed above.

85.     More particularly, defendants' employees and agents were instructed not to collect the co-payment as required by Medicare without proof of financial hardship which requires a good faith attempt to determine the patient's actual financial condition. This was in effect a marketing tool to increase patient census and resulted in the buying of patients by defendants. The list of patients for the time period is maintained at Ten Broeck Hospital-KMI, Louisville, Kentucky, Ten Broeck Hospital-Dupont, Louisville, Kentucky, TenBroeck Hospital, Jacksonville, Florida and St. Claude Medical Center, New Orleans, Louisiana institution. On information and belief, the same practice was and is going on at multiple hospitals owned by the defendants in Puerto Rico.

86.     The amount of false claim damages incurred by the failure to collect the co-payment can be determined by an audit of defendants' books and

records for Medicare patient billing. On information and belief, these false claims exceed **$2,000,000.**

## Count VIII

## False Medicare-Medicaid Claims Based on Anti-Dumping-Payor Source Violations

87.     The practice of discriminating and denying services at all hospitals was based upon social class, race and ability to pay and was improper

88.     During the relevant time period, defendants paid prohibited stipends to doctors who referred large numbers of patients in comparison to the rest of the medical staff in New Orleans, Louisiana and in Jacksonville, Florida. Executive Officers were ordered by the defendants to threaten doctors with the removal of compensation (ranging from $50,000 to $900,000 per year per referring doctor) if they did not increase their admissions or reduce care for poor patients. Additionally, CEOs were ordered to threaten Emergency Department doctors with the removal of financial compensation if they did not eliminate non-paying patients from the hospital in New Orleans, Louisiana regardless of the patient's medical condition.

89.     This resulted in an atmosphere at the Jacksonville, Florida and the New Orleans, Louisiana hospitals of paying for patients. During the relevant time period, the defendants did not once discuss the any duties related to the monies paid, but only to the doctors' admission volumes and payor sources for these patients.

90.     This atmosphere of being paid or suffering financial loss for staff doctors resulted in questionable admissions that resulted in loss to the government through both the payment of monies not due and the time value of interest of the paid monies.

91.     Anti-dumping penalties exceed **$1,000,000** and are calculated at the rate of $50,000 per dumped patient.

## Count IX

## Medicare-Medicaid Violations Based on Unlawful Enterprise Activities

92.     UMC adopted a business strategy of not paying its vendors. UMC directed that vendors not be paid.  Once the vendor refused to provide additional goods and services, the company would find a different vendor and refuse to pay the original vendor.  Thus, defendants unlawfully reported to the government operating costs from vendors they never intended to pay.

## Count X

## Violations of Civil Rights of Patients and Employees And ERISA Violations Based on Fraudulent Health Care Deductions and Discrimination in Retirement Programs Based on Race

93.     The practice of discriminating and denying services at all hospitals based upon social class, disability and ability to pay was improper

94.     Gilbert disclosed to defendants that the company was improperly operating ERISA plans and deducting health, dental and disability benefits but

failing to deposit such money into an escrow account and failing to pay claims as required by law. In addition, Gilbert warned Don Dizney, Chairman of UMC, about forcing executives to recruit only white doctors for St. Claude Medical Center

95.     Defendants directly advised plaintiff not to pay the healthcare expenses of St. Claude's employees, who were told and understood that they did have medical coverage through their employee plan, but no employee plan was in effect.

96.     The policy of deducting funds from employees' salaries for healthcare insurance and then not funding the healthcare insurance was in violation of state and federal law.

97.     Defendants established retirement programs at their white hospitals in Kentucky and Florida but refused to permit a retirement program at St. Claude Medical Center in New Orleans because the staff – employees and doctors – was predominantly African-American.

## Count XI

## Unlawful Tax Reporting

98.     The wrongful activities related hereinafter are part of a conspiracy enterprise by the defendants to obtain unlawful revenue by submitting false claims under the Medicare and Medicaid system administered by the Government. And defendants have used the aforesaid enterprise to file questionable tax returns, in particular by declaring losses from the operation of

St. Claude Medical Center by temporarily making loans to the institution but withdrawing those funds shortly after the close of the tax year, thus permitting defendants to declare operating losses based in part on vendor expenses – which they did not pay and never intended to pay.

## Count XII

## Violation of Hospital Standards

99.     On July 13, 1999, Nurse Grunewald reported to senior management operational deficiencies at St. Claude Medical Center since July 13, 1990. A copy of the report is attached as Exhibit 2.

100.    Beginning in January of 2000, Cameron Gilbert began reporting to the officers and directors of UMC, including James English, Pat Hammer and Kevin Barkman, that business practices at St. Claude were in violation of state and federal law. Cameron Gilbert repeatedly advised and warned defendants' officers and directors of unlawful business practices, including but not limited to:

> 1)     Charging the hospitals for, and reporting on the Medicare and/or Medicaid reimbursement cost reports, executive salaries, travel, alcohol and entertainment unrelated to the operation of the hospitals or the providing of health care, was prohibited by law.

> 2)     The failure to maintain the equipment at the hospital not only put the patients at risk but had been the direct cause of several deaths at the hospital. David Dizney directly ordered

the plaintiff not to purchase basic and required life support equipment, the lack of which resulted in the death of at least one patient. Dizney refused to buy basic surgical equipment, basic wall suction, functioning ICU monitors, wall oxygen, working refrigerators for the kitchen and basic kitchen appliances and working security cameras. All of this undermined the humanitarian and financial mission of the hospital.

3)   That it was unlawful not to collect the Medicare co-payment as a marketing scheme to increase hospital census.

4)   St. Claude Medical Center had less than 50 available beds and the number of beds needed to be increased above 100.

5)   Gilbert was often forced to use his own funds to purchase needed items and prevent repossession;

6)   Gilbert was not allowed to repair/replace a broken air conditioning unit and thus was forced to run the hospital without air conditioning in the summer of 2001. This resulted in daily indoor temperatures of 100 degrees Fahrenheit; extreme discomfort for patients, doctors and staff; and numerous complaints. Also, due to the heat, patients and staff would open windows for air, leading to significant insect infiltration, which angered doctors, decreased census,

decreased surgeries, decreased staff morale and caused unbearable discomfort;

7) Intensive Care Units and surgical rooms were substandard;

8) Many bathrooms and wheelchairs were dilapidated and dangerous, resulting in patient injuries and complaints.

9) The plumbing system was not functioning correctly and breaks in the pipes routinely resulted in ceiling collapses and water and sewage spilling out into patient areas. ICU monitors and equipment would often be damaged by water pouring down;

10) Construction was needed for infection control of dirty/soiled linens, but funds and approval were denied and these linens were placed in open, non-contained areas;

11) Sterilization was inadequate and dangerous but plaintiff was denied funds and approval to replace;

12) Construction was necessary for a psychiatric patient holding room in the emergency room, because employees and patients were being violently injured, but defendants denied funds and approval;

13) Overhead call systems for codes were not functioning properly, but defendants denied funds and approval to replace, increasing danger to patients and staff;

14) The laboratory equipment was inferior and dangerous, often resulting in errors, which resulted in at least one patient death.

15) Malfunctioning elevators often resulted in patients, doctors and staff being trapped on elevators, or angry doctors, patients and staff having to walk multiple flights of stairs. Functioning elevators were essential given that the hospital is five stories tall, but Gilbert's requests for replacements were denied.

### General Allegations

101.    Although the actual submission of false claims was done by employees of the defendants, the hospitals and the holding companies, their actions and knowledge are imputed as a matter of law to their employers and to the owners and executive officers who instructed that false claims be presented.

102.    The threat of being paid or suffering financial loss for stipend doctors resulted in questionable admissions that resulted in loss to the government through both the payment of monies not due and the time value of interest of the paid monies.

103.    This resulted in an atmosphere at the Jacksonville, Florida and the New Orleans, Louisiana hospitals of paying for patients. During the relevant time period, the defendants did not once discuss the any duties related to the

monies paid, but only the doctors' admission volumes and payor sources for these patients.

104.    As a result of these actions, defendants knowingly violated federal laws regarding the inducement of or paying for patient admissions and resulted in false claims.

105.    Upon information and belief, each and every defendant knowingly and intentionally conspired to commit each of the acts referenced above.

## Jury Trial

106.    A jury trial is demanded on all issues.

### PRAYER FOR RELIEF

**WHEREFORE,** Relators, on their own behalf and on behalf of the United States, request and pray for the following relief:

a.    That defendants make full restitution to the United States of all monies wrongfully expended by the federal government in general and the Medicare and Medicaid Programs in particular, in connection with the defendants' wrongful and unlawful conduct;

b.    That defendants be assessed all fines, penalties, attorney's fees and costs, pursuant to 31 U.S.C. §§ 3729 and 3730;

c.    That judgment be entered in Relators' favor against defendants in accordance herewith and that Relators be awarded thirty percent (30%) of the

proceeds collected in connection herewith, plus reasonable attorneys' fees and costs; and

      d.     For such relief as this Court may deem appropriate.

                             Respectfully submitted,

                             JAMES F. WILLEFORD (Bar #13485)
                             201 St. Charles Avenue, Suite 3907
                             New Orleans, Louisiana 70170
                             Telephone: (504) 582-1286
                             Facsimile: 313-692-5927
                             Email: willeford@bellsouth.net

Service will be made on:

The Hon. Jim Letten
United States Attorney
Eastern District of Louisiana
Second Floor, Hale Boggs Federal Building
501 Magazine Street
New Orleans, LA 70130

The Hon. John Ashcroft
Attorney General of the United States
Department of Justice
Washington, DC 20530

**As per §3730(b)(2), no service is to be made on defendants until the court so orders.**

## Verification

Before me, the undersigned authority, came and appeared Cameron R. Gilbert, who declared that he is a relator in the above and foregoing Complaint, that he has read the allegations contained therein and that the allegations are true and correct to the best of his knowledge, information and belief.

Cameron R. Gilbert

Sworn to and subscribed before me, the undersigned Notary,
This __7__ day of February, 2003.

James F. Willeford,
Notary Public