# facsimile
## TRANSMITTAL

**To:** Gwen McGinnis, CEO

**Of:** St.Claude Medical Center

**Fax:** 504-949-0298

**Pages:** 6, including this cover sheet.

**Date:** January 25, 2000

Attached please find our site visit report for the partial hospital program. I will send a hard copy of the report to your attention as soon as the snow storm ends.

Thank you for the opportunity to work with on this engagement. I am still working on the other issue and will get back to you as soon as possible.

*[signature]*

EXHIBIT 1

From the desk of...

Martin M. Slutsky
President & CEO
M. Slutsky & Associates, Inc
6248 Audubon Drive
Columbia, Maryland 21044-3815
(410)992-4350
Fax: (410)992-3568

## St. Claude Partial Hospital Program Audit Report

At the request of Cameron Gilbert, M. Slutsky and Associates conducted a site audit of the St. Claude Partial Hospital Program. We were asked to review the program to determine the degree of compliance with Medicare and Trispan (the fiscal intermediary) regulations and guidelines. The Local Medical Review Policy distributed by Trispan on July 30, 1998 with effective date of August 30, 1998 was used as a reference. On Wednesday, January 19, 2000, we interviewed Charlotte Pedit, Christina Greer, and Dr. Palazzo, the Medical Director of the Partial Hospital Program. We reviewed three charts. We appreciate the time staff took from their busy schedules to meet with us.

The partial hospital program is providing a much needed service for a population that is often under-served. These are difficult patients with multiple needs who, in the not too distant past, would have probably been placed indefinitely in state hospitals. The program staff are to be commended for the hard work and willingness to provide the high level of therapeutic services needed for this population.

We have outlined a few recommendations below that we feel could improve the program and the documentation in a way that would make it more "Medicare" friendly. To summarize, our major concerns related to Medicare reimbursement come from the following:

1. The long term chronicity of the patients' problems;
2. Lack of progress documented for patients despite active and long term treatment (e.g., greater than 3-6 months);
3. Overall, long lengths of stay.

These concerns come from past experience with other Medicare Fiscal Intermediaries as well as the Trispan Medical review policy (page 2) that states: "...programs are designed to treat patients who exhibit severe or disabling conditions related to an **acute** psychiatric/psychological condition or an **exacerbation** of a severe and persistent mental disorder." "The length of stay in a PHP is dependent upon the patient's psychiatric problems, clinical needs, types of treatment and response to treatment. Many factors affect the outcome of treatment; among them are the nature of the illness, the prior history, the goals of treatment and the patient's response. **It is anticipated that a patient accepted into the PHP, would be promptly evaluated within 24 hours of admission and expediently treated, then be maintained in an outpatient setting.**"

After speaking with Dr. Palazzo, we feel that she may be able to adequately justify the need for continuing stay and treatment of this primarily chronic population of patients. Thus, if denials occur, they may be overturned at the Fair Hearing or Administrative Law Judge appeal with Dr. Palazzo explaining her case rationale. However, this appeal process may take one to two years to be completed and the program will go without payment until the case is overturned.

**Review Summary:** The partial hospital program was opened in June of 1999. There are no specific partial hospital licensing in the state of Louisiana. The hospital will be surveyed for JCAHO accreditation in March of this year. (We did not discuss this, but my experience has

been that JCAHO expects that a program with an average daily census greater than 10, would be accredited under the behavioral health standards versus straight hospital.)

Patients seem to be referred mostly by Dr. Palazzo. There is no formal screening process other than the referral by Dr. Palazzo. The patients served live primarily in low structured group homes. The patients tend to have a long history of psychiatric hospitalizations. Medication non-compliance is frequent issue.

The program day consists of four groups, one of which is an Activity Therapy, one of which is a psychoeducational or nursing group. The two remaining groups are provided by the social workers. Individual therapy is provided once per week by the assigned case manager/social worker. The program meets the description as outlined on page 2 of the Trispan guidelines, it has available 20 hours of scheduled programming extending over a minimum of five days per week; utilizes a multi-disciplinary team, services are coordinated within an individualized treatment plan, and the individual is under the care of a physician.

**Documentation Review:** The findings from the review of the three records were consistent with previous findings (see report dated August 9 and December 1, 1999). General concerns about these records and previous reviews related to initial documentation include: Illegibility of Physician Progress Notes prior to 9/99; History and Physicals delayed or not completed within time frame; relatively high Global Assessment of Functioning ratings; target dates of long and short term goals not updated. Based on the current review of records the following is recommended:

1. Clearly document a patient's ability to benefit from treatment modalities despite Mental Retardation diagnosis. This would also apply to patients with other forms of disability that would reasonably be expected to interfere with treatment such as hearing disability. (For example, a sentence or two would be included on the initial Psychiatric Assessment, stating something to the effect that the patient has demonstrated through past experience an ability to comprehend and participate in group oriented activities including psychotherapy group and coping skills training and that the treatment can reasonably be expected to improve the individual's functioning.) Ongoing documentation should support the individual's ability to participate as described on page 13, bullet 8 of the Trispan Medical Review Policy.

2. Medication Compliance: For the patient with a MR/MI dual diagnosis mentioned above, a goal for discharge was medication compliance, yet it was stated that his personal care assistant distributed his medication. It was unclear if it was reasonable to expect that the patient would eventually be able to administer his own medication. If not, perhaps his personal care assistant needed some training in monitoring medication compliance (e.g., having the individual talk to him after putting the pills in his mouth or waiting until the individual swallows; or the patient may need a more structured living arrangement). It could be reasonable to question whether all patients can be expected to achieve medication compliance. Following six months of active treatment with medication compliance as a goal without success, it would be reasonable to explore other options such as IM medication or referral to a structured residential program where medication could be monitored more closely.

3. Overall, progress notes, including those by the physician (at least weekly) need to be more clearly tied to treatment plan goals with some mention of progress or lack thereof in meeting those goals. It would also be important to periodically (e.g. twice per month) mention medication in the physician notes. This would be something to the effect of the physician assessment of the efficacy of the patient's medication regimen and whether any change is being considered, and if not, rationale for not changing medication (especially if the patient continues to show active psychosis).

4. It was not clear what the expected level of functioning would be for many of the patients served. Documentation regarding their "best" or optimal functioning in the past would be helpful in justifying the level of active treatment being provided. See p.3 of the Trispan Medical Review Policy that states that partial hospital is "an appropriate level of active treatment intervention for individuals who: Are likely to benefit from a coordinated program of services..." If the patient has never achieved a higher level of functioning, it would be important to explain the rationale for expecting the patient to reach a higher level.

5. Documentation of continued appropriateness for treatment following transfer to inpatient and readmission to the partial program. It is recommended that when patients are readmitted following inpatient hospitalization, something that occurs somewhat regularly by report of staff, the criteria for admission be specifically documented again. This could be done on a checklist with brief narrative, or an Admission Note by the physician. An example of a simple checklist is included in this report. Because there is no formal screening process prior to admission, this checklist or a similar one is recommended for all admissions.

6. Treatment Plans should include specific interventions (not just "group") tied to specific goals. See page 17 of the Trispan Medical Review Policy which state as noncovered services "Any service that does not have a specific treatment goal." The current treatment plans lump groups together rather than breaking these out by intervention. Examples of specific groups used in other partial hospital programs include Psychotherapy (usually one per day); Coping Skills Group; Symptom Management Group (often a nursing group); Relapse Prevention Group; Relaxation Training Group (often an Activity Group).

7. Related to the above, Target Dates should be extended if the patient continues past original dates. It is not typically sufficient to extend the expected date of discharge.

8. Treatment of co-morbid substance abuse. It is expected that partial hospitals will "be prepared to appropriately treat the co-morbid substance abuse disorder (dual diagnosis patients), when it exists" p.8 Trispan Medical Review Policy. As a number of the partial patients do suffer from this, it would be important for the program to have a plan for incorporating this treatment more specifically into the schedule. This could be done, for example, by having an assessment that could be ordered by the physician, monitoring known users for continued use through period drug testing, offering a specific substance abuse group for appropriate patients and including this on their treatment plan.

9. The rationale for continued stay as described on the Treatment Plan Reviews could be

strengthened by including patient-specific information such as whether the patient experienced a crisis during the past month (death of family member, stressful holiday), any history of relapse behavior, reports by care takers or case managers, documented that when patient was not in program, she or he decompensated or demonstrated decreased functioning. This would be particularly important for those patients who continue in treatment greater than three months.

**Summary**: We believe that the program provides a quality service to meet the needs of a very difficult and under served population. Our primary concern is the length of stay as it relates to Medicare's focus of "expedient treatment". We have provided above recommendations that we believe, if followed will assist the hospital in making a case with the fiscal intermediary for the extended lengths of stay.

Attachment: Sample Medical Necessity Checklist

## MEDICAL NECESSITY CHECKLIST

Patient Name: _____   Date: _____

**GENERAL CRITIERIA (all must be met)**

☐ The patient diagnosis meets the DSM-IV criteria, with emphasis of Axis I and falls within the range of ICD-9 codes for mental illness (if not, strong clinical justification is documented to support admission);

☐ The patient has a Global Assessment of Functioning of below 40 [31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family and is unable to work)]. GAF above 40 can be taken but will require strong justification for this level of care.

☐ The patient exhibits a recent (past 6 months) decompensation resulting in an inability to carry out activities of daily living such as (indicate at least one):

    ☐ Function in a manner that is safe to self and others;

    ☐ Carry out that which is required to run and/or cooperatively function in a place of residence;

    ☐ Conduct activities in the community that are required to meet daily living needs (e.g., purchasing items, paying bills, communication with and use of public transportation, accessing community resources);

    ☐ Communicate and interact with others in a manner that is appropriate to a given situation and circumstance.

☐ The patient is likely to benefit from a coordinated program of services and requires more than isolated sessions of outpatient treatment;

☐ The patient does not require 24 hour care and has adequate support system outside the hospital setting while not actively engaged in the program;

☐ The patient is not judged to be in imminent dangerousness to self or others;

☐ The patient is able to participate in all aspects of the program;

☐ The patient is experiencing severe psychiatric symptoms that impairs his/her ability to function adequately on a day to day basis without the intervention of the partial hospital program.

**The partial hospital program is being recommended because the patient's current symptoms are severe enough that (one must be present):**

☐ Hospitalization is possible without intensive intervention;

☐ Hospitalization is no longer required (e.g., In lieu of continued inpatient treatment (dates of inpatient: _____ );

☐ Current level of outpatient treatment (specify duration, frequency & practitioner below) is not effectively reducing symptoms;

☐ Traditional outpatient treatment would not be appropriate now due to severity of symptoms

Comments: _____
_____
_____

Signature: _____   Date: _____



# MEMORANDUM

**To:** Cameron Gilbert, VPCO

**From:** Pat Grunewald, RDCS  *PG*

**Subject:** St. Claude's Regulatory Compliance

**Date:** July 13, 1999

**CC:** Pat Hammer, Sr. VPHO, Gwen McGinnis, John Hollinsworth, VPFO

---

The following is a listing of the initial problems identified at St. Claude that must be dealt with before they can expect to be in minimal compliance with JCAHO regulations. This is not an all encompassing listing because many areas, departments, minutes and policies were not able to be evaluated in only two days.

1. Many policy books and disks have disappeared from the facility. Many policies that do exist are outdated and do not reflect current practice. Several key policies (i.e., Ethics Code, Sentinental Event) have never been developed or implemented..

2. Performance Improvement has basically taken a hiatus since January 1999. Some Quality Improvement activities have continued but have not been properly reported through appropriate avenues/committees.

3. Many standing committees (i.e. Pharmacy and Therapeutics) have not met since sometime last year.

4. No ADR's or DUE's have been reported in 1999. The numbers reported in 1998 are unbelievably low.

5. Many Job Descriptions are missing (i.e. CEO and Nurse Executive). Many need revisions.

6. No age specific competency testing has been obtained.

7. No bench marking with Orynx indicators.

8. Bio-Med testing very delinquent.

9. Multiple Plant Operation issues (i.e. chill pans, roof).

10. No Internal Review Board or External Review Board for oversight of the two clinical drug trials.

11. Credentialing Process appears in question (i.e. Clinical Coordinator).

EXHIBIT

Cameron Gilbert, VPCO
Page 2
July 13, 1999

12. Required reports to Advisory Board have not been done (i.e. H.R., Risk Management).

13. No documentation of orientations for physicians, students, etc.

14. No employee handbook.

15. No age-specific Pediatric Assessment Tool.

16. No established discharge criteria for Med-Surg. Units.

17. No Q.I. profiles for physicians that are needed for the re-credentialing process.

18. No Y2K compliance plan.

19. Medical staff QA report missing for fourth quarter 1998 and no reports for 1999 found.

20. Multiple additional issues with FernCrest facility (i.e. no physician coverage).

All information was obtained through interview of staff. No charts, committee meeting minutes, policies, reports, etc. were reviewed. Only Administration, Nursing, Medical Records, Risk Management, Credentialing, Pharmacy and Performance Improvement were discussed.

The following is a listing of our immediate plans:

1. Several projects have recently been started (i.e. revision of Job Descriptions). These we will continue to monitor the process and expedite if possible.

2. Policies from Louisville have already begun being shared (i.e. Sentinental Event Process). The Director of Nursing and the Director of Medical Records will be developing St. Claude's processes.

3. Lists have been faxed to the Director of Nursing, the Director of Medical Records and the Pharmacy Director regarding tasks to be completed before my return.

4. Karen Jones has agreed to accompany me the week of July 19th to assess and begin the restoration of the Human Resource Department.

5. I am assuming that the Director of Nursing has been "tagged" by Gwen McInnis to coordinate the efforts at St. Claude.

6. I will remain in telephone contact with St. Claude and return the week of July 19th.